# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Number 05-183C
Judge Nancy B. Firestone

**KAEPER MACHINE, INCORPORATED**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

## PLAINTIFF'S BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Cyrus E. Phillips, IV
1828 L Street, N.W., Suite 660
Washington, D.C. 20036-5112
Attorney of record for Plaintiff,
Kaeper Machine, Incorporated.

August 10th, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................ii

QUESTIONS INVOLVED ....................1

I. DID KAEPER MACHINE PROVIDE "SUBSTANTIAL PERFORMANCE" WITHIN THE MEANING OF 48 C.F.R. 13.004(B)? ....................1

II. IS THE PROCURING CONTRACTING OFFICER EQUITABLY ESTOPPED FROM CLAIMING THAT THE PURCHASE ORDER HAD "LAPSED"? ....................1

STATEMENT OF THE CASE ....................1-13

ARGUMENT ....................13-20

I. KAEPER MACHINE PROVIDED "SUBSTANTIAL PERFORMANCE" WITHIN THE MEANING OF 48 C.F.R. 13.004(B). ....................13-15

II. THE PROCURING CONTRACTING OFFICER IS EQUITABLY ESTOPPED FROM CLAIMING A "LAPSE" ....................15-20

CONCLUSION ....................20-21

CERTIFICATE OF SERVICE ....................22

# TABLE OF AUTHORITIES

**_STATUTES_**

41 U.S.C. §§ 601-613 ........ 2

41 U.S.C. § 601(2) ........ 2

41 U.S.C. § 601(4) ........ 1

41 U.S.C. § 602(a)(1) ........ 2

**_REGULATIONS_**

Federal Acquisition Regulation 13.004 ........ 11

Federal Acquisition Regulation 13.302-4 ........ 12-13

**_CASES_**

*Connor Brothers Construction Company , Inc. v. United States,*
65 Fed. Cl. 657 (2005) ........ 15-16

*Emeco Industries, Inc. v. United States,*
485 F.2d 652 (Ct. Cl. 1973) ........ 16-17

*Franklin E. Penny Co. v. United States,*
524 F.2d 668 (Ct. Cl. 1975) ........ 15

# PLAINTIFF'S BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## QUESTIONS INVOLVED

I. Did Kaeper Machine provide "substantial performance" within the meaning of 48 C.F.R. 13.004(b)?

II. Is the Procuring Contracting Officer at Defense Supply Center Columbus equitably estopped from claiming that the Purchase Order had "lapsed?"

## STATEMENT OF THE CASE

**Parties**.

Kaeper Machine is a for-profit Ohio corporation. Kaeper Machine is the awardee of Purchase Order Number SP0750-04-M-9839, and thus a proper "Contractor" under the Contract Disputes Act, 41 U.S.C. § 601(4). Purchase Order Number SP0750-04-M-9839 was issued on February 20th, 2004 by a Procuring Contracting Officer at Defense Supply Center Columbus, a field activity of the Defense Logistics Agency located near Columbus, Ohio. Defense Logistics Agency is a United States Department of Defense component. Defendants Defense Supply Center Columbus, Defense Logistics Agency, and the United States Department of Defense are agencies and entities of the United States, and the United States Department of Defense is a proper "Executive Agency" under the Con-

tract Disputes Act, 41 U.S.C. § 601(2). Purchase Order Number SP0750-04-M-9839 is an express unilateral option contract entered into by an Executive Agency for the procurement of property, and thus an Executive Agency Contract to which the Contract Disputes Act applies, 41 U.S.C. § 602(a)-(1).

**The Unilateral Purchase Order**.

On February 20th, 2004 a Procuring Contracting Officer at Defense Supply Center Columbus issued Purchase Order Number SP0750-04-M-9839 to Kaeper Machine. As issued, Purchase Order Number SP0750-04-M-9839 was a unilateral offer subject to the Contract Disputes Act, 41 U.S.C. §§ 601-613. Purchase Order Number SP0750-04-M-9839 contained the Disputes (July 2002) clause, Federal Acquisition Regulation [48 C.F.R.] 52.233-1(c), a clause which provided that "this contract is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613)."

Purchase Order Number SP0750-04-M-9839 required delivery of other than commercial items, *viz*. one-hundred forty-six cast steel armor housing assemblies built to designated United States Army Tank-Automotive Command drawings, and these cast steel armor housing assemblies were to be inspected in accordance with Department of Defense Handbook MIL-HDBK-1265, entitled "Radiographic Inspection, Classification and Soundness Requirements for Steel Castings," dated August 19th, 1998. Purchase Order Number SP0750-04-M-9839 did not require delivery of all one-hundred forty-six cast steel armor housing assemblies at one time. Deliveries were to be made on or before August 23rd, 2004. Inspection and acceptance of these one-hundred forty-six cast steel armor housing

assemblies, other than commercial items, was to be at origin, at Kaeper Machine's subcontractor for packaging, Forest City Companies, Incorporated, 3607 West 56th Street, Cleveland, Ohio 44102-5739 (Forest City Companies). Inspection and acceptance was to be performed by an assigned Quality Assurance Representative. Upon deliveries, Kaeper Machine was to be paid $858.00 for each of these cast steel armor housing assemblies, other than commercial item, or $125,268 total for one-hundred forty-six cast steel armor housing assemblies, other than commercial items.

On February 26th, 2004 Kaeper Machine subcontracted performance of Purchase Order Number SP0750-04-M-9839 to Euclid Machine, Incorporated, 34201 Melinz Parkway, Eastlake, Ohio 44095-4018 (Euclid Machine). Euclid Machine was to be paid $720.00 for each of these cast steel armor housing assemblies, other than commercial items, or $105,120 total for one-hundred forty-six cast steel armor housing assemblies, other than commercial items.

**Substantial Performance**.

On July 18th, 2004 Kaeper Machine wrote the Administrative Contracting Officer at Cleveland, Ohio to request that the inspection point be changed from Kaeper Machine to Euclid Machine. On July 22nd, 2004 Kaeper Machine wrote the Administrative Contracting Officer at Cleveland, Ohio to request that the inspection point and the acceptance point be changed from Kaeper Machine to Euclid Machine and to request that the inspection and acceptance point for packaging be changed from Forest City Companies to Euclid Machine.

On July 22nd, 2004 a representative of the Administrative Contracting Officer at Cleveland, Ohio sent an electronic message to the Procuring Contracting Officer at Defense Supply Center Columbus to "give you a heads-up—Kaeper Machine has an association with Euclid Machine and Mr. Oh." The Procuring Contracting Officer then notified her house counsel at Defense Supply Center Columbus, and the Procuring Contracting Officer then told her house counsel that she supposed that Euclid Machine would provide Kaeper Machine non-conforming goods from a lot of non-conforming goods, the same cast steel armor housing assemblies, other than commercial items, that had been received from Euclid Machine on another Purchase Order earlier issued by Defense Supply Center Columbus and that were later found to be defective. Next, the Procuring Contracting Officer told the Item Manager at Defense Supply Center Columbus about her concerns, and the Item Manager decided to place a "freeze code" on any cast steel armor housing assemblies delivered by Euclid Machine under its subcontract with Kaeper Machine. None of these concerns, and none of these decisions, were shared with Kaeper Machine, or with Euclid Machine.

On August 4th, 2004 Kaeper Machine asked the Administrative Contracting Officer at Cleveland, Ohio to extend the final delivery date for Purchase Order Number SP0750-04-M-9839 from August 23rd, 2004 to October 11th, 2004. October 11th, 2004 was a Monday, and was a Federal holiday, Columbus Day. On August 18th, 2004 Kaeper Machine sent an electronic message to the Administrative Contracting Officer at Cleveland, Ohio offering a $1,989 reduction in the $125,268 total price for Purchase Order Number SP0750-04-M-9839 in exchange for the delivery schedule extension. On

August 19th, 2004 the Administrative Contracting Officer in Cleveland, Ohio asked the Procuring Contracting Officer whether he should proceed as Kaeper Machine had requested, and that same day the Procuring Contracting Officer at Defense Supply Center Columbus agreed.

On August 27th, 2004 Purchase Order Number SP0750-04-M-9839 was formally modified. The final delivery date was extended from August 23rd, 2004 through October 11th, 2004, and the total price of the Purchase Order was reduced by $1,989 from $125,268 to $123,279. This formal Modification, Number A00001, did not require delivery of all one-hundred forty-six cast steel armor housing assemblies at one time.

On Tuesday, September 14th, 2004 the assigned Quality Assurance Representative rejected cast steel armor housing assemblies, other than commercial items, that had been presented for Government source inspection by Euclid Machine, this because one piece of inspection equipment on the premises of Kaeper Machine's subcontractor, Euclid Machine, was found to be beyond the date established by Euclid Machine for re-calibration of this piece of inspection equipment. Euclid Machine was given written notice of this problem, a Corrective Action Request, on Monday, September 20th, 2004, and Euclid Machine responded to this notice on that day. On Thursday, September 23rd, 2004 the assigned Quality Assurance Representative presented a revised Corrective Action Request to Euclid Machine, this revised Corrective Action Request explaining that it was the Standard for Euclid Machine's dial bore gage, not Euclid Machine's dial bore gage itself that was beyond the date established by Euclid Machine for re-calibration. Euclid Machine responded to this revised Corrective Ac-

tion Request on Friday, September 24th, 2004, explaining that Euclid Machine's dial bore gage Standard, a "setting block," was within calibration at the time Euclid Machine had verified the accuracy of this dial bore gage Standard. On Thursday, September 30th, 2004 the assigned Quality Assurance Representative presented Euclid Machine an "Audit Checklist," and Euclid Machine returned the completed "Audit Checklist" to the assigned Quality Assurance Representative on Friday, October 1st, 2004. The assigned Quality Assurance Representative usually gives a Contractor ten working days to answer a Corrective Action Request, else to ask for an extension. As it turned out, on this Purchase Order there was one Corrective Action Request, and two revisions to this Corrective Action Request, that were given to Euclid Machine.

On Tuesday, October 5th, 2004 the assigned Quality Assurance Representative issued a second revised Corrective Action Request to Euclid Machine. This second revised Corrective Action Request addressed the assigned Quality Assurance Representative's concerns with Euclid Machine's dial bore gage Standard, explaining: (a) that the questioned dial bore gage Standard was not shown to have been "calibrated against certified equipment having known traceability to a nationally or internationally recognized standard," (b) that Euclid Machine had not shown how it "was able to ensure that the required environmental conditions are suitable for the calibration on the calibrated inspection equipment," and (c) that "[c]alibration integrity is not protected and maintained during handling, transportation, preservation, and storage of inspection, measuring and test equipment." The assigned Quality Assurance Representative wrote Euclid that "[i]t is requested that you inform the undersign-

ed in writing by October 19, 2004 the root causes of the deficiencies noted and the corrective action that you intend to pursue." On Wednesday, October 6th, 2004 the assigned Quality Assurance Representative issued a written Corrective Action Request to Kaeper Machine, the prime Contractor. The assigned Quality Assurance Representative wrote that the "Root Cause of Defect" was that: "Prime contractor, [sic] not controlling sub tiers. Not verifying Quality Systems at vendors. Also not controlling the sub vendors calibration system." The assigned Quality Assurance Representative asked Kaeper Machine to "[p]lease respond to this corrective action request 10/20/2004."

On Wednesday, October 6th, 2004 Kaeper Machine sent an electronic message to the Administrative Contracting Officer at Cleveland, Ohio and to the Procuring Contracting Officer at Defense Supply Center Columbus. Kaeper Machine then said that due to the Corrective Action Request that had been issued to Euclid Machine, "Kaeper will not meet the 10-11-04 delivery date . . . ." Kaeper Machine asked that the final delivery date be extended until November 12th, 2004. The Procuring Contracting Officer at Defense Supply Center Columbus that day sent an electronic message to the Administrative Contracting Officer at Cleveland, Ohio and there said that "[i]f Kaeper Machine is unable to meet this delivery schedule, the order will be cancelled." This decision of the Procuring Contracting Officer at Defense Supply Center Columbus was not made known to Kaeper Machine, or to Euclid Machine, until two days later, on Friday, October 8th, 2004.

In a response to the Procuring Contracting Officer at Defense Supply Center Columbus, the Administrative Contracting Officer at Cleveland, Ohio reported on Thursday, October 7th, 2004:

> I just spoke with Kay Hwang, Kaeper's owner. He is scrambling, in the 11th hour, to get these completed. He is awaiting a Corrective Action Response from Jim Oh at Euclid Machine. I expect to hear from him tomorrow. I do not anticipate, unless he is also a magician, that these will be ready by Monday's FDD. I'll let you know once I hear from him.

On Thursday, October 7th, 2004 Mr. Oh at Euclid Machine telephoned the assigned Quality Assurance Representative's Supervisor because the assigned Quality Assurance Representative was away from his Office, attending a class. The assigned Quality Assurance Representative returned the telephone call:

> I called him back and the main reason he called was to get clarification about the CAR that I had presented to him over his calibration system. He also wanted me to tell him when I would be able to come in to perform GSI [Government source inspection] on the parts he had ready for me. He did not tell me any specific number. We mostly talked about the CAR. I told him that I would call on Tuesday Oct. 12 when I returned to work as I was in class and was going to take Friday off. . . .

On Friday, October 8th, 2004 the Administrative Contracting Officer at Cleveland, Ohio wrote Kaeper Machine:

> On October 6th, we were contacted by your consultant, Mr Mike Jefferis. He requested a delivery extension on the subject contract. The rational [sic] for this request was that an outstanding Corrective Action Request (CAR), issued to your subcontractor, remained unresolved. As a result of this open CAR, we were advised that Kaeper Machine would not meet the contractual delivery date (CDD) of October 11, 2004.
>
> As you know, the original CDD was Aug. 23, 2004. That date was revised to Oct 11, 2004 by modification A00001. In consideration for this contractual revision, Kaeper Machine offered and the Government accepted a reduction of $1989.00 in the purchase order amount.
>
> Be advised that, after due consideration, if Kaeper Machine is unable to meet this delivery schedule of Oct. 11, 2004, the order will be cancelled. Since your company offered the consideration noted above, we may peruse [sic] collection of this amount as a debt owed to the Government.

The Administrative Contracting Officer's "due consideration" did not reflect on the facts: (a) that a total of three Corrective Action Requests had been issued to the subcontractor Euclid Machine, or (b) that the second two of these three Corrective Action Requests had been issued to correct or revise the earlier Corrective Action Requests. The Administrative Contracting Officer's "due consideration" did not reflect on the Corrective Action Request that had been issued to the prime Contractor, Kaeper Machine, on Wednesday, October 6th, 2004, nor did the Administrative Contracting Officer's "due consideration" reflect on the telephone communications of Thursday, October 7th, 2004 between Euclid Machine and the assigned Quality Assurance Representative. Neither did the Administrative Contracting Officer recognize that Monday, October 11th, 2004 was a Federal holiday, Columbus Day.

At 8:30 a.m. on Tuesday, October 12th, 2004 Mr. Oh at Euclid Machine telephoned the assigned Quality Assurance Representative, and the assigned Quality Assurance Representative then agreed "to visit his facility on Oct. 13 at 9 AM." Mr. Oh then "implied" in this telephone conversation that Euclid Machine had cast steel armor housing assemblies, other than commercial items, ready for Government source inspection. But the assigned Quality Assurance Representative "would not look at parts until the corrective action is complied with. . . ."

Early in the afternoon on Tuesday, October 12th, 2004 the Administrative Contracting Officer at Cleveland, Ohio reported to the Procuring Contracting Officer at Defense Supply Center Columbus:

> The contractor did not ship product by the CDD of 10/11/04. Kaeper's response to an outstanding corrective action request (CAR) was received today, 10/12/04; the response is

> under review. Kaeper expects to ship product within the next few days. This is only possible if the CAR response adequately addresses the Quality system deficiency . . . the contractor's record keeping of equipment calibration was found to be lacking under a MIL-I or ISO system.

In a letter dated Monday, October 11th, 2004 and in fact sent by facsimile, also early in the afternoon on Tuesday, October 12th, 2004 to the Administrative Contracting Officer at Cleveland, Ohio, outside counsel for Euclid Machine wrote:

> As you have already been made aware, forty-six (46) of the one hundred and forty-six (146) parts ordered pursuant to the referenced contract have already been completed, and await only final inspection, approval, and acceptance by your Department before they can be delivered. The remaining one hundred (100) pieces are also completely machined and ready for inspection, and require only painting (and inspection of the painting) before they, too, can be delivered. All issues related to any Corrective Action Request ("CAR") previously issued in connection with the ordered parts have been resolved, and all requested corrective actions on these parts were completed by both the prime and subcontractors on a timely basis which, if required inspections had been timely completed per the contractors' requests to your Department, would have resulted in delivery of all ordered parts on or before the extended contract delivery date ("CDD").
>
> If the Government's reluctance to further extend the CDD by the few days needed to complete the inspection, painting and subsequent re-inspection of the now finished-but-unpainted pieces is based upon any time-sensitivity for acquisition of the parts, termination of the contract will certainly not address that concern. There would be no time-benefit gained by refusing to inspect and accept the completely-finished parts which are now sitting and waiting for delivery, and those which require only painting and final paint-inspection, and subsequently seeking bids for a new contract for these same parts from a new supplier which will have to start the manufacturing process from the beginning. The immediate availability of the parts on hand provides the Government with the best opportunity to fulfill the duty to mitigate which is incumbent upon all parties to contracts, even the Government. Also, since at least part of the failure to deliver the completed parts by October 11, 2004, was the direct result of your Department providing inadequate documentation to Euclid in connection with the CAR, and the unavailability of any inspector prior to October 12, 2004, due to staff meetings and/or legal holidays affecting your Department's work schedule, it would seem that the most reasonable and logical course of action would be for the Government to reconsider its threatened cancellation of the contract, and for all

> parties to make arrangements for the immediate inspection of the completely-finished parts, and the painting and final inspection of the as yet-unpainted parts, and the prompt conclusion of this matter to their joint and mutual satisfaction.

Neither Kaeper Machine, nor Euclid Machine, nor Euclid Machine's outside counsel then knew of the Procuring Contracting Officer's decision to place a "freeze code" on any cast steel armor housing assemblies delivered by Euclid Machine under its subcontract with Kaeper Machine.

The Federal Acquisition Regulation provides:

> (a) A quotation is not an offer and, consequently, cannot be accepted by the Government to form a binding contract. *Therefore, issuance by the Government of an order in response to a supplier's quotation does not establish a contract. The order is an offer by the Government to the supplier to buy certain supplies or services upon specified terms and conditions. A contract is established when the supplier accepts the offer.*
>
> (b) When appropriate, the contracting officer may ask the supplier to indicate acceptance of an order by notification to the Government, preferably in writing, as defined at 2.101. *In other circumstances, the supplier may indicate acceptance by furnishing the supplies or services ordered or by proceeding with the work to the point where substantial performance has occurred.*
>
> (c) If the Government issues an order resulting from a quotation, the Government may (by written notice to the supplier, at any time before acceptance occurs) withdraw, amend, or cancel its offer. (See 13.302-4 for procedures on termination or cancellation of purchase orders.)

Federal Acquisition Regulation [48 C.F.R.] 13.004, "Legal Effect of Quotations" (emphasis added).

**The Procuring Contracting Officer's Claim**
**<u>That The Unilateral Purchase Order Had "Lapsed."</u>**

Later in the afternoon on Tuesday, October 12th, 2004 the Procuring Contracting Officer at Defense Supply Center Columbus wrote Kaeper Machine that Purchase Order Number SP0750-04-M-9839:

> was an offer to purchase the supplies described therein provided that delivery was made by 10/11/2004. Since that date was not met, the Government's offer to purchase has lapsed. No delivery will be accepted by the Government under this order . . . .

Kaeper Machine received a facsimile of this communication, Modification Number P00001, on the day that it was issued, Tuesday, October 12th, 2004.

In an electronic message of Wednesday, October 13th, 2004 sent to the Administrative Contracting Officer at Cleveland, Ohio, with a copy to her house counsel at Defense Supply Center Columbus, the Procuring Contracting Officer at Defense Supply Center Columbus reported:

> It was my understanding that Kaeper Machine did not request source inspection on the above order due to a CAR with Mr. Oh at Euclid. Therefore, I withdrew the order.

In fact, Euclid Machine had telephoned the assigned Quality Assurance Representative at 8:30 a.m. on Tuesday, October 12th, 2004 and had then "implied" that Euclid Machine had cast steel armor housing assemblies, other than commercial items, ready for Government source inspection.

As to terminations or cancellations of Purchase Orders, the Federal Acquisition Regulation provides:

> (a) If a purchase order that has been accepted in writing by the contractor is to be terminated, the contracting officer shall process the termination in accordance with—

> (1) 12.403(d) and 52.212-4(l) for commercial items; or
> (2) Part 49 or 52.213-4 for other than commercial items.
>
> (b) *If a purchase order that has not been accepted in writing by the contractor is to be canceled, the contracting officer shall notify the contractor in writing that the purchase order has been canceled, request the contractor's written acceptance of the cancellation, and proceed as follows*:
> (1) If the contractor accepts the cancellation and does not claim that costs were incurred as a result of beginning performance under the purchase order, no further action is required (*i.e.*, the purchase order shall be considered canceled).
> (2) *If the contractor does not accept the cancellation or claims that costs were incurred as a result of beginning performance under the purchase order, the contracting officer shall process the termination action as prescribed in paragraph (a) of this subsection.*

Federal Acquisition Regulation [48 C.F.R.] 13.302-4, "Termination or Cancellation of Purchase Orders" (emphasis added).

The Procuring Contracting Officer at Defense Supply Center Columbus did not, as required by Federal Acquisition Regulation 13.302-4(b), request Kaeper Machine's written acceptance of a cancellation before unilaterally declaring that Purchase Order Number SP0750-04-M-9839 had "lapsed."

---

## ARGUMENT

---

### I. Kaeper Machine Provided "Substantial Performance" Within the Meaning of 48 C.F.R. 13.004(b).

Per Federal Acquisition Regulation 13.004(b), Purchase Orders may be accepted by substantial performance. "Substantial performance" under Purchase Order Number SP0750-04-M-9839 was not limited to a tender of all one-hundred forty-six cast steel armor housing assemblies, be-

cause Purchase Order Number SP0750-04-M-9839 did not require delivery of all one-hundred forty-six cast steel armor housing assemblies at one time. Euclid Machine, Kaeper Machine's subcontractor, first tendered cast steel armor housing assemblies for Government source inspection on Tuesday, September 14th, 2004, well before October 11th, 2004, the date established in Modification Number A00001 for the final delivery of all one-hundred forty-six cast steel armor housing assemblies.

And the cast steel armor housing assemblies that were tendered for Government source inspection on Tuesday, September 14th, 2004 were not rejected because of any observed defect in these cast steel armor housing assemblies. Rather, these cast steel armor housing assemblies were rejected by the assigned Quality Assurance Representative because the assigned Quality Assurance Representative was not satisfied that Euclid Machine had demonstrated that the Standard for Euclid Machine's dial bore gage was itself shown to have been properly calibrated, or that Euclid Machine had shown that "required environmental conditions" were suitable at the time of calibration of Euclid Machine's dial bore gage against Euclid Machine's dial bore gage Standard, or that Euclid Machine had shown that it protected the "calibration integrity" of Euclid Machine's dial bore gage and Euclid Machine's dial bore gage Standard. These concerns of the assigned Quality Assurance Representative, though legitimate questions about Euclid Machine's record-keeping, were not concerns about the quality of the cast steel armor housing assemblies that Euclid Machine had presented for Government source inspection.

And Euclid Machine was about to make another tender of cast steel armor housing assemblies for Government source inspection on Wednesday, October 13th, 2004. If there was a "deviation" in the performance of Euclid Machine under Purchase Order Number SP0750-04-M-9839, this "deviation" was only in Euclid Machine's record-keeping, not in the cast steel armor housing assemblies that Euclid Machine was presenting for Government source inspection. Defense Supply Center Columbus bargained for cast steel armor housing assemblies, not for a system of record-keeping. *Franklin E. Penny Co. v. United States*, 367 F.2d 668, 677 (Ct. Cl. 1975) ("By the same token, however, the doctrine should not be carried to the point here the non-defaulting party is compelled to accept a measure of performance fundamentally less than had been bargained for.").

**II. The Procuring Contracting Officer at Defense Supply Center Columbus Is Equitably Estopped From Claiming A "Lapse."**

All of the requisite elements of an equitable estoppel are present here—the Procuring Contracting Officer at Defense Supply Center Columbus is barred from claiming that Purchase Order Number SP0750-04-M-9839 had "lapsed" by October 12th, 2004 because Kaeper Machine had not then tendered all one-hundred forty-six cast steel armor housing assemblies to be built to designated United States Army Tank-Automotive Command drawings:

> The doctrine of equitable estoppel bars a party from raising a defense or an objection it otherwise would have. *Biagioli, 2 Cl. Ct. at 307* (quoting *Jablon v. United States, 657 F.2d 1064, 1068 (9th Cir. 1981)*). The affirmative defense of equitable estoppel requires that the asserting party reasonably relied upon the conduct of the estopped party. *Henry*

> *v. United States, 870 F.2d 634, 636-37 (Fed. Cir. 1989)*. The elements of equitable estoppel are: (1) *misleading conduct, which may include not only statements and action but silence and inaction, leading another to reasonably infer that rights will not be asserted against it*; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted. *Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes, Inc., 971 F.2d 732, 734 (Fed. Cir. 1992)*; *see also A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1041 (Fed. Cir. 1992)* (stating that this formulation of the three elements of equitable estoppel "reflects a reasonable and fairly complete distillation from the case law"). An explicit representation is not a necessary precondition for a finding of equitable estoppel. *Hercules Inc. v. United States, 49 Fed. Cl. 80, 88 (2001)*, *aff'd*, *292 F.3d at 1378*. Estoppel may lie for a course of conduct, without misrepresentation, by the estopped party. *Id.* "'*This latter view is in accord with those cases that hold that a party who engages in a course of conduct, even without misrepresentation, upon which another party has a right to believe he is intended to act or upon which the first party intends him to act, will be estopped from repudiating the effect of such conduct.*'" *Id.* (citing *Emeco Indus., Inc. v. United States, 485 F.2d 652, 657, 202 Ct. Cl. 1006 (Ct. Cl. 1973)*). In addition to these requisites, it is an established proposition that estoppel cannot be set up against the government on the basis of an unauthorized representation or act of an officer or employee who is without authority in his individual capacity to bind the government. *See Byrne Org., Inc. v. United States, 287 F.2d 582, 587, 152 Ct. Cl. 578 (Ct. Cl. 1961)*.

*Connor Brothers Construction Company, Inc. v. United States*, 65 Fed. Cl. 657, 693 (2005) (emphasis added).

The facts here are much like the facts in *Emeco Industries, Inc. v. United States*, 485 F.2d 652 (Ct. Cl. 1973). There a Contractor had spent $10,300 for the necessary dies to make steel index card boxes, and the Contractor had ordered the materials necessary to fabricate the entire requirement of the General Services Administration, a requirement for the manufacture of 31,896 steel index card boxes. The Contractor had submitted the low bid at public bid opening, and the Contractor's plant had been subjected to a pre-award survey, a pre-award survey not necessary for Contracts less than

$10,000. The General Services Administration knew that the Contractor had not previously manufactured steel index card boxes and thus would have to purchase dies to make them. And the General Services Administration knew that the Contractor's bid of $3.04 per steel index card box was an average that took into consideration the costs of manufacturing the entire requirement of 31,896 steel index card boxes. When the Contractor received an order for 2,713 steel index card boxes at a total of $8,247.52, the Contractor assumed that the additional orders would follow. Only thereafter did the Contractor learn that the General Services Administration had accepted a late bid on a partial quantity of the requirement, and had awarded two Contracts, one for 29,183 steel index card boxes at $2.78 each, and one for the remaining quantity, 2,713 steel index card boxes at $3.04 each.

Per the *Emeco Industries* Court, it was the General Service Administration's failure to speak up when it should have that required an equitable estoppel to preclude the General Services Administration from denying the existence of a Contract for the entire requirement of 31,896 steel index card boxes:

> Under the circumstances of this case, it is important to stress the failure of the defendant to inform plaintiff of the receipt of Art Steel's late bid, for only when it is kept clearly in mind is one able to understand why plaintiff acted as it did. Along the same line, it is important to refrain from evaluating plaintiff's acts from a hindsight vantage point, based on all the facts, since the facts were not known to plaintiff at the time it acted.

*Id.*, 485 F.2d 652, at 658-659.

Here, the Procuring Contracting Officer at Defense Supply Center Columbus never communicated her concerns about the cast steel armor housing assemblies to Kaeper Machine, or to Euclid

Machine, and never did she tell Kaeper Machine, or Euclid Machine, that any cast steel armor housing assemblies delivered on Purchase Order Number SP0750-04-M-9839 would be placed under a "freeze code" and suspended from issue.

The course of conduct of the assigned Quality Assurance Representative precluded Euclid Machine from tendering cast steel armor housing assemblies for Government source inspection: (a) the assigned Quality Assurance Representative did not promptly explain to Euclid Machine his concerns with Euclid Machine's record-keeping, since it took from Tuesday, September 14th through Tuesday, October 5th for the assigned Quality Assurance Representative to explain himself, and (b) the assigned Quality Assurance Representative was unavailable to conduct Government source inspection at Euclid Machine on Thursday, October 7th, or on Friday, October 8th, or on Monday, October 11th, or on Tuesday, October 12th.

The Administrative Contracting Officer at Cleveland took action that could only have intimidated and confused Kaeper Machine and Euclid Machine when he: (a) delayed for two critical days, from Wednesday, October 6th through Friday, October 8th, from telling Kaeper Machine and Euclid Machine that the Procuring Contract Officer at Defense Supply Center Columbus would insist on delivery of all one-hundred forty-six cast steel armor housing assemblies on Monday, October 11th, a Federal holiday; and (b) threatened to seek recovery of the price reduction previously agreed for the delivery schedule extension under Purchase Order Number SP0750-04-M-9839, a sum to which the United States was clearly not entitled, and made this threat: (1) without any consideration of the

three confused Corrective Action Requests that had been issued by the assigned Quality Assurance Representative to Euclid Machine, (2) without any consideration of the Corrective Action Request that had been issued by the assigned Quality Assurance Representative to Kaeper Machine, and (3) without any consideration of the telephone communication of Thursday, October 7th between Euclid Machine and the assigned Quality Assurance Representative.

Finally, the Procuring Contracting Officer at Defense Supply Center Columbus claimed that Purchase Order Number SP0750-04-M-9839 had lapsed on Tuesday, October 12th because she supposed that Euclid Machine had failed to request Government source inspection due to the pending Corrective Action Requests. In fact, Euclid Machine had presented cast steel armor housing assemblies for Government source inspection on Tuesday, September 14th, and on the morning of Tuesday, October 12th Euclid Machine had again requested Government source inspection.

And the subject of the Corrective Action Requests was not the quality *vel non* of the cast steel armor housing assemblies that Euclid Machine had presented, and sought to present, for Government source inspection. Instead, the subject of these Corrective Action Requests was Euclid Machine's record-keeping, and Kaeper Machine's supposed failure to monitor Euclid Machine's record-keeping.

These actions, and inactions, on the part of the Procuring Contracting Officer at Defense Supply Center Columbus, on the part of the Administrative Contracting Officer at Cleveland, and on the part of the assigned Quality Assurance Representative, amount to more than a sufficient reason for

this Court now to equitably estop the Procuring Contracting Officer at Defense Supply Center Columbus from claiming that Purchase Order Number SP0750-04-M-9839 "lapsed" on Tuesday, October 12th, 2004.

## CONCLUSION

For all of the reasons set forth in the foregoing Brief in Support of Plaintiff's Motion for Summary Judgment, Kaeper Machine respectfully requests that the Court grant Plaintiff's Motion for Summary Judgment upon all of Plaintiff's Claims, and requests: (a) that this Court declare that Defendants' Procuring Contracting Officer is equitably estopped from terminating Purchase Order Number SP0750-04-M-9839 as "lapsed" on October 12th, 2004; (b) that this Court order the Defendants' Procuring Contracting Officer to proceed with the termination of Purchase Order Number SP0750-04-M-9839 under the Terms and Conditions—Simplified Acquisitions (Other Than Commercial Items) (January 2004) clause, Federal Acquisition Regulation [48 C.F.R.] 52.213-4(f); and (c) that this Court grant such other and further relief as may be just and proper.

Respectfully submitted,

/s/ Cyrus E. Phillips, IV

Cyrus E. Phillips, IV

1828 L Street, N.W., Suite 660
Washington, D.C. 20036-5112

Telephone: (202) 466-7008
Facsimile: (202) 466-7009
Electronic Mail: lawyer@procurement-lawyer.com

Attorney of record for Plaintiff,
Kaeper Machine, Incorporated.

## CERTIFICATE OF SERVICE

Pursuant to RCFC 5.1(b), I hereby certify that on Thursday, August 10th, 2006 a true and complete copy of this Brief in Support of Plaintiff's Motion for Summary Judgment was filed electronically via the Court's Electronic Case Filing System, through which notice of the filing will be sent to:

J. Reid Prouty, Esq.

Electronic Mail: J.Reid.Prouty@usdoj.gov

Attorney of record for Defendant,
Defense Supply Center Columbus.

/s/ Cyrus E. Phillips, IV

______________________________
Cyrus E. Phillips, IV

Attorney of record for Plaintiff,
Kaeper Machine, Incorporated.