IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KAEPER MACHINE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 05-183C |
| v. | ) | |
| | ) | (Judge Firestone) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

In accordance with Rule 56(h)(2) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits the following response to plaintiff's proposed findings of uncontroverted facts, dated August 10, 2006.

1. Kaeper Machine is a for-profit Ohio corporation. Kaeper Machine is the awardee of Purchase Order Number SP0750-04-M-9839. Attachment 1.

Response: Agrees that Kaeper Machine, Inc. ("Kaeper") was the awardee of the referenced purchase order. The attachment does not support the remainder of the allegations.

2. Defendant is the Defense Supply Center Columbus, a field activity of the Defense Logistics Agency located near Columbus, Ohio. Defense Logistics Agency is a United States Department of Defense component. Defendants Defense Supply Center Columbus, Defense Logistics Agency, and the United States Department of Defense are agencies and entities of the United States.

Response: Agrees.

3. On February 20th, 2004 a Procuring Contracting Officer at Defense Supply Center Columbus issued Purchase Order Number SP0750-04-M-9839 to Kaeper Machine. As issued, Purchase Order Number SP0750-04-M-9839 was a unilateral offer subject to the Contract Disputes Act, 41 U.S.C. §§ 601-613. Purchase Order Number SP0750-04-M-9839 contained the Disputes (July 2002) clause, Federal Acquisition Regulation [48 C.F.R.] 52.233-1(c), a clause which provided that "this contract is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613)." Attachment 1.

Response: Agrees that the referenced purchase order was issued to Kaeper at the date stated and that it included the "Disputes clause" cited. The legal effect of that clause is not an uncontroverted fact.

4. Purchase Order Number SP0750-04-M-9839 required delivery of other than commercial items, *viz*. one-hundred forty-six cast steel armor housing assemblies built to designated United States Army Tank-Automotive Command drawings, Attachment 4, and these cast steel armor housing assemblies were to be inspected in accordance with Department of Defense Handbook MIL-HDBK-1265, entitled "Radiographic Inspection, Classification and Soundness Requirements for Steel Castings," dated August 19th, 1998. Purchase Order Number SP0750-04-M-9839 did not require delivery of all one-hundred forty-six cast steel armor housing assemblies at one time. Deliveries were to be made on or before August 23rd, 2004. Inspection and acceptance of these one-hundred forty-six cast steel armor housing assemblies, other than commercial items, was to be at origin, at Kaeper Machine's subcontractor for packaging, Forest City Companies, Incorporated, 3607 West 56th Street, Cleveland, Ohio 44102-5739 (Forest City Companies). Inspection and acceptance was to be performed by an assigned Quality Assurance Representative. Upon deliveries,

Kaeper Machine was to be paid $858.00 for each of these cast steel armor housing assemblies, other than commercial item, or $125,268 total for one-hundred forty-six cast steel armor housing assemblies, other than commercial items. Attachment 1.

Response: Agrees.

5. On February 26th, 2004 Kaeper Machine subcontracted performance of Purchase Order Number SP0750-04-M-9839 to Euclid Machine, Incorporated, 34201 Melinz Parkway, Eastlake, Ohio 44095-4018 (Euclid Machine). Euclid Machine was to be paid $720.00 for each of these cast steel armor housing assemblies, other than commercial items, or $105,120 total for one-hundred forty-six cast steel armor housing assemblies, other than commercial items. Attachment 5.

Response: Agrees

6. On July 18th, 2004 Kaeper Machine wrote the Administrative Contracting Officer at Cleveland, Ohio to request that the inspection point be changed from Kaeper Machine to Euclid Machine. Attachment 6. On July 22nd, 2004 Kaeper Machine wrote the Administrative Contracting Officer at Cleveland, Ohio to request that the inspection point and the acceptance point be changed from Kaeper Machine to Euclid Machine and to request that the inspection and acceptance point for packaging be changed from Forest City Companies to Euclid Machine. Attachment 7.

Response: Agrees.

7. On July 22nd, 2004 a representative of the Administrative Contracting Officer at Cleveland, Ohio sent an electronic message to the Procuring Contracting Officer at Defense Supply Center Columbus to "give you a heads-up—Kaeper Machine has an association with Euclid Machine and Mr. Oh." The Procuring Contracting Officer then notified her house counsel at Defense Supply Center Columbus, and the Procuring Contracting Officer then told her house

counsel that she supposed that Euclid Machine would provide Kaeper Machine non-conforming goods from a lot of non-conforming goods, the same cast steel armor housing assemblies, other than commercial items, that had been received from Euclid Machine on another Purchase Order earlier issued by Defense Supply Center Columbus and were later found to be defective. Next, the Procuring Contracting Officer told the Item Manager at Defense Supply Center Columbus about her concerns, and the Item Manager decided to place a "freeze code" on any cast steel armor housing assemblies delivered by Euclid Machine under its subcontract with Kaeper Machine. Attachment 8. None of these concerns, and none of these decisions, were shared with Kaeper Machine, or with Euclid Machine.

Response: Agrees only that the representative of the administrative contracting officer was given information in the e-mail that Kaeper had an association with Euclid Machine Co. ("Euclid"); that Euclid had provided nonconforming armored housings in the past; that Ms. Lavery speculated that Euclid might provide Kaeper 40 non-conforming armored housings; and that Ms. Lavery inquired whether a "freeze code" would be put upon the stock, although she did not direct it. The remainder of the allegations are not supported by the attachment cited by Kaeper.

8. On August 4th, 2004 Kaeper Machine asked the Administrative Contracting Officer at Cleveland, Ohio to extend the final delivery date for Purchase Order Number SP0750-04-M-9839 from August 23rd, 2004 to October 11th, 2004. Attachment 9. October 11th, 2004 was a Monday, and was a Federal holiday, Columbus Day. On August 18th, 2004 Kaeper Machine sent an electronic message to the Administrative Contracting Officer at Cleveland, Ohio offering

a $1,989 reduction in the $125,268 total price for Purchase Order Number SP0750-04-M-9839 in exchange for the delivery schedule extension. On August 19th, 2004 the Administrative Contracting Officer in Cleveland, Ohio asked the Procuring Contracting Officer whether he should proceed as Kaeper Machine had requested, and that same day the Procuring Contracting Officer at Defense Supply Center Columbus agreed. Attachment 10.

Response: Agrees.

9. On August 27th, 2004 Purchase Order Number SP0750-04-M-9839 was formally modified. The final delivery date was extended from August 23rd, 2004 through October 11th, 2004, and the total price of the Purchase Order was reduced by $1,989 from $125,268 to $123,279. This formal Modification, Number A00001, did not require delivery of all one-hundred forty-six cast steel armor housing assemblies at one time. Attachment 2.

Response: Agrees.

10. On Tuesday, September 14th, 2004 the assigned Quality Assurance Representative rejected cast steel armor housing assemblies, other than commercial items, that had been presented for Government source inspection by Euclid Machine, this because one piece of inspection equipment on the premises of Kaeper Machine's subcontractor, Euclid Machine, was found to be beyond the date established by Euclid Machine for re-calibration of this piece of inspection equipment. Euclid Machine was given written notice of this problem, a Corrective Action Request, on Monday, September 20th, 2004, and Euclid Machine responded to this notice on that day. On Thursday, September 23rd, 2004 the assigned Quality Assurance Representative presented a revised Corrective Action Request to Euclid Machine, this revised Corrective Action Request explaining that it was the Standard for Euclid Machine's dial bore gage, not Euclid

Machine's dial bore gage itself that was beyond the date established by Euclid Machine for re-calibration. Euclid Machine responded to this revised Corrective Action Request on Friday, September 24th, 2004, explaining that Euclid Machine's dial bore gage Standard, a "setting block," was within calibration at the time Euclid Machine had verified the accuracy of this dial bore gage Standard. On Thursday, September 30th, 2004 the assigned Quality Assurance Representative presented Euclid Machine an "Audit Checklist," and Euclid Machine returned the completed "Audit Checklist" to the assigned Quality Assurance Representative on Friday, October 1st, 2004. The assigned Quality Assurance Representative usually gives a Contractor ten working days to answer a Corrective Action Request, else to ask for an extension. Attachment 18. As it turned out, on this Purchase Order there was one Corrective Action Request, and two revisions to this Corrective Action Request, that were given to Euclid Machine.

Response: Objects to this statement because Kaeper includes no citation to any document, affidavit, or declaration supporting it. Moreover, it is inconsistent with known evidence as reflected in "Defendant's Proposed Finding of Uncontroverted Facts" filed today.

11. On Tuesday, October 5th, 2004 the assigned Quality Assurance Representative issued a second revised Corrective Action Request to Euclid Machine. This second revised Corrective Action Request addressed the assigned Quality Assurance Representative's concerns with Euclid Machine's dial bore gage Standard, explaining: (a) that the questioned dial bore gage Standard was not shown to have been "calibrated against certified equipment having known traceability to a nationally or internationally recognized standard," (b) that Euclid Machine had not shown how it "was able to ensure that the required environmental conditions are suitable for

the calibration on the calibrated inspection equipment," and (c) that "[c]alibration integrity is not protected and maintained during handling, transportation, preservation, and storage of inspection, measuring and test equipment." The assigned Quality Assurance Representative wrote Euclid that "[i]t is requested that you inform the undersigned in writing by October 19, 2004 the root causes of the deficiencies noted and the corrective action that you intend to pursue." Attachment 11. On Wednesday, October 6th, 2004 the assigned Quality Assurance Representative issued a written Corrective Action Request to Kaeper Machine, the prime Contractor. The assigned Quality Assurance Representative wrote that the "Root Cause of Defect" was that: "Prime contractor, [sic] not controlling sub tiers. Not verifying Quality Systems at vendors. Also not controlling the sub vendors calibration system." The assigned Quality Assurance Representative asked Kaeper Machine to "[p]lease respond to this corrective action request 10/20/2004." Attachment 12.

Response: Agrees.

12. On Wednesday, October 6th, 2004 Kaeper Machine sent an electronic message to the Administrative Contracting Officer at Cleveland, Ohio and to the Procuring Contracting Officer at Defense Supply Center Columbus. Kaeper Machine then said that due to the Corrective Action Request that had been issued to Euclid Machine, "Kaeper will not meet the 10-11-04 delivery date . . . ." Kaeper Machine asked that the final delivery date be extended until November 12th, 2004. The Procuring Contracting Officer at Defense Supply Center Columbus that day sent an electronic message to the Administrative Contracting Officer at Cleveland, Ohio and there said that "[i]f Kaeper Machine is unable to meet this delivery schedule, the order will be cancelled." Attachment 13. This decision of the Procuring Contracting Officer at Defense

Supply Center Columbus was not made known to Kaeper Machine, or to Euclid Machine, until two days later, on Friday, October 8th, 2004.

Response: Agrees that Kaeper sent the e-mail noted on October 6, 2004, but the document cited by Kaeper reflects that the contracting officer sent her e-mail to the administrative contracting officer on October 7, 2004, not on October 6, 2004 as stated herein. Moreover, Kaeper neglects to note that the documents also reflect that the matter was being discussed with Kaeper on October 7, 2004.

13. In a response to the Procuring Contracting Officer at Defense Supply Center Columbus, the Administrative Contracting Officer at Cleveland, Ohio reported on Thursday, October 7th, 2004:

> I just spoke with Kay Hwang, Kaeper's owner. He is scrambling, in the 11th hour, to get these completed. He is awaiting a Corrective Action Response from Jim Oh at Euclid Machine. I expect to hear from him tomorrow. I do not anticipate, unless he is also a magician, that these will be ready by Monday's FDD. I'll let you know once I hear from him. Attachment 13.

Response: Agrees.

14. On Thursday, October 7th, 2004 Mr. Oh at Euclid Machine telephoned the assigned Quality Assurance Representative's Supervisor because the assigned Quality Assurance Representative was away from his Office, attending a class. The assigned Quality Assurance Representative returned the telephone call:

> I called him back and the main reason he called was to get clarification about the CAR that I had presented to him over his calibration system. He also wanted me to tell him when I would be able to come in to perform GSI [Government source inspection] on the parts he had ready for me. He did not tell me any specific

> number. We mostly talked about the CAR. I told him that I would call on Tuesday Oct. 12 when I returned to work as I was in class and was going to take Friday off. . . .

Attachment 18.

Response: Agrees that this reflects an e-mail written by Mr. Takacs

15. On Friday, October 8th, 2004 the Administrative Contracting Officer at Cleveland, Ohio wrote Kaeper Machine:

> On October 6th, we were contacted by your consultant, Mr Mike Jefferis. He requested a delivery extension on the subject contract. The rational [sic] for this request was that an outstanding Corrective Action Request (CAR), issued to your subcontractor, remained unresolved. As a result of this open CAR, we were advised that Kaeper Machine would not meet the contractual delivery date (CDD) of October 11, 2004.
>
> As you know, the original CDD was Aug. 23, 2004. That date was revised to Oct 11, 2004 by modification A00001. In consideration for this contractual revision, Kaeper Machine offered and the Government accepted a reduction of $1989.00 in the purchase order amount.
>
> Be advised that, after due consideration, if Kaeper Machine is unable to meet this delivery schedule of Oct. 11, 2004, the order will be cancelled. Since your company offered the consideration noted above, we may peruse [sic] collection of this amount as a debt owed to the Government.

Attachment 14.

Response: Agrees.

16. The Administrative Contracting Officer's "due consideration" did not reflect on the facts: (a) that a total of three Corrective Action Requests had been issued to the subcontractor Euclid Machine, or (b) that the second two of these three Corrective Action Requests had been issued to correct or revise the earlier Corrective Action Requests. The Administrative

Contracting Officer's "due consideration" did not reflect on the Corrective Action Request that had been issued to the prime Contractor, Kaeper Machine, on Wednesday, October 6th, 2004, nor did the Administrative Contracting Officer's "due consideration" reflect on the telephone communications of Thursday, October 7th, 2004 between Euclid Machine and the assigned Quality Assurance Representative. Neither did the Administrative Contracting Officer recognize that Monday, October 11th, 2004 was a Federal holiday, Columbus Day.

Response: Objects to this statement because Kaeper includes no reference to any document, affidavit, or declaration supporting it.

17. At 8:30 a.m. on Tuesday, October 12th, 2004 Mr. Oh at Euclid Machine telephoned the assigned Quality Assurance Representative, and the assigned Quality Assurance Representative then agreed "to visit his facility on Oct. 13 at 9 AM." Attachments 17, 19. Mr. Oh then "implied" in this telephone conversation that Euclid Machine had cast steel armor housing assemblies, other than commercial items, ready for Government source inspection. But the assigned Quality Assurance Representative "would not look at parts until the corrective action is complied with. . . ." Attachment 17.

Response: Agrees that Mr. Takacs agreed to visit the Euclid facility on October 13, 2004 and that Mr. Takacs stated he would not look at the parts until the CAR was complied with. Mr. Takacs's e-mail, which is the basis for this statement does not reflect an implication that Euclid had all of the parts ready for inspection, and, in fact, stated that Mr. Oh "did not tell me a specific number" of parts ready for inspection and that he questioned whether Mr. Oh was "even ready right now." Atch 17.

18. Early in the afternoon on Tuesday, October 12th, 2004 the Administrative Contracting Officer at Cleveland, Ohio reported to the Procuring Contracting Officer at Defense Supply Center Columbus:

> The contractor did not ship product by the CDD of 10/11/04. Kaeper's response to an outstanding corrective action request (CAR) was received today, 10/12/04; the response is under review. Kaeper expects to ship product within the next few days. This is only possible if the CAR response adequately addresses the Quality system deficiency . . . the contractor's record keeping of equipment calibration was found to be lacking under a MIL-I or ISO system.

Attachment 15.

<u>Response</u>: Agrees.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Mark D. Melnick
MARK D. MELNICK
Assistant Director

s/ J. Reid Prouty
J. REID PROUTY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, DC 20530
Tele: (202) 305-7586
Fax: (202) 514-7969

September 13 , 2006

Attorneys for Defendant