# In the United States Court of Federal Claims

| | | |
|---|---|---|
| KAEPER MACHINE, INCORPORATED, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 05-183C |
| | ) | Judge Nancy B. Firestone |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

PLAINTIFF'S RESPONSE TO DEFENDANT'S
PROPOSED FINDINGS OF UNCONTROVERTED FACT

Plaintiff, Kaeper Machine, Incorporated, 8680 Twinbrook Road, Mentor, Ohio 44060-4341 (Kaeper Machine), in compliance with RCFC 56(h)(2), sets out the following responses to Defendant's Proposed Findings of Uncontroverted Fact.

1. On November 17, 2003, the Defense Supply Center Columbus ("DSCC") in Columbus, Ohio, issued Solicitation SP0750-04-Q-A827 for the procurement of 146 units of an armored suspension housing assembly ("the armored housing") for

use in United States Army M88 Tank Recovery Vehicles. The armored housings are "other than commercial items."

Response: Agrees.

2. On December 30, 2004, after plaintiff, Kaeper Machine, Inc. ("Kaeper") submitted its initial quote for the armored housings, DSSC sent Kaeper an e-mail asking it to verify its entire quote. This e-mail also stated, in bold font: "You need to certify and verify to the undersigned that you can in fact make this item as required by our drawings and all requirements of the RFQ for this URGENT REQUIREMENT!!!!!"

Response: Agrees.

3. Kaeper ultimately submitted a "best and final offer" on February 12, 2004, with a price of $867 per unit and a delivery time of 185 days. Kaeper certified that it would perform all of the manufacturing, machining, and painting.

Response: Agrees, except that the unit price was $858, not $867. Plaintiff's Attachment 1.

4. On February 20, 2004, DSSC awarded purchase order SP0750-04-M-9839 ("the purchase order") to Kaeper for the production of the armored housings. The

purchase order was for 146 units to be delivered by August 23, 2004. The purchase order specified that the Defense Contract Management Agency ("DCMCA") Cleveland would administer it.

Response: Agrees.

5. By letters dated July 18, 2004 and July 22, 2004, Kaeper requested that the contract officer, Betty Lavery, change the inspection and acceptance point of the armored housings from Kaeper, as previously required by the purchase order, to Euclid Machine Company ("Euclid"), with the packaging inspection point to be changed from Forest Cities Companies to Euclid.

Response: Agrees.

6. On July 26, 2004, Mr. Steve Haschack, the DCMA contract administrator for the purchase order, denied Kaeper's request to change the inspection and delivery point of the armored housings.

Response: Agrees, save that the man's name is "Haschak." Plaintiff's Attachment 7.

7. On August 4, 2004, Kaeper requested that the delivery date of 100 of the armored housings be changed from August 23, 2004 to October 11, 2004.

Response: Agrees.

8. DCMA agreed to extend the delivery date for all 146 of the armored housings upon condition that Kaeper reduce its price by $1,989. Kaeper agreed and DCMA issued the necessary contract modification on August 27, 2004. The packaging inspection and acceptance address remained Forest City Companies.

Response: Agrees.

9. Euclid, Kaeper's subcontractor which was responsible for performing all of the work upon the armored housings, had built such housings for use by the Army before, but they had been rejected because they did not conform to the specifications.

Response: Disagrees. The only evidence, per Plaintiff's Attachment 8, is that these cast steel armor housing assemblies delivered by Euclid were rejected *after* Defense Supply Center Columbus "had the supplies shipped to the lab, which [and they] failed." There is no evidence that Euclid knew that these cast steel armor housing as-

semblies were rejected after they had been received at Defense Supply Center Columbus.

10. Mr. Ed Takacs, of the DCMA, was the quality assurance representative ("QAR") responsible for inspecting items manufactured by Euclid. He performed his first inspection of the armored housings for the purchase order here (Euclid had fabricated 46 of the 146 thus far) on September 14, 2004.

Response: Agrees.

11. What Mr. Takacs observed during his inspection caused him concern that the armored housings produced by Euclid did not conform with the specifications and would thus be useless in the field

Response: Agrees.

12. Upon Mr. Takacs's arrival at Euclid on September 14, 2004, he randomly selected an armored housing for his inspection. The first problem that he encountered was that the appropriate thread gage did not fit into the threaded bolt holes on this housing. In simplified terms, a thread gage is a standard, which is used to ensure that the corresponding threaded hole on a manufactured item is of the correct size. If a thread gage does not fit into its corresponding hole, then it is unlikely

that the corresponding bolt will fit the hole in the field and the item may be useless. Mr. Oh, the owner of Euclid, was present when Mr. Takacs attempted to utilize the thread gage in the armored housing that his company had manufactured. For several of the holes, the corresponding gage only fit after Mr. Oh made extensive efforts remove debris and otherwise intervene. Ultimately, however, the thread gage would not fit into some of the corresponding holes, no matter what efforts Mr. Oh made. Mr. Takacs then informed Mr. Oh that he would reject the parts and issue a corrective action request ("CAR") to Euclid.

Response: Disagrees. The issue of the thread gage must have been resolved because it was not the subject of the subsequent Corrective Action Requests of October 5th, 2004, Plaintiff's Attachment 11, or of October 6th, 2004, Plaintiff's Attachment 12.

13. A CAR identifies a deficiency in an item which has been inspected and informs the contractor what needs to be done to remedy it. Generally, a CAR includes a deadline for corrective action, but, the QAR will work with the contractor to give the company more time to address the matter, if it is requested by the contractor. The decision of a QAR to allow a contractor time to address an issue in a CAR bears no relationship, whatsoever, to the delivery deadline in a contract, which is

purely within the province of the contracting officer. No QAR possesses the authority to extend delivery deadlines by virtue of issuance of a CAR.

Response: Agrees.

14. The timing of inspections by DCMA QARs is not driven by the delivery deadline for a contract: because the QARs are responsible for multiple contractors, DCMA policy is only that the QAR inspectors will visit the contractor within seven days of being requested to do so. All contractors with whom DCMA does business are aware of this limitation.

Response: Disagrees. On Thursday, October 7th, 2004 Euclid telephoned the Quality Assurance Representative to request Government Source Inspection, and the Quality Assurance Representative then agreed to call at Euclid's premises on Wednesday, October 13th, 2004, only six days after being requested to do so. Plaintiff's Attachment 18.

15. After the armored assembly failed the thread gage test, Mr. Oh requested that Mr. Takacs complete the inspection of the armored assembly to ensure that it had no other failures. For the next part of the inspection, Mr. Takacs was to use a dial bore gage, which is a very precise standard used to measure the size of un-

threaded holes. Mr. Takacs immediately noticed that the dial bore gage (owned and maintained by Euclid, as required), was not current in its calibration. This is important because, over time, a dial bore gage (like many precision instruments, including the thread gage discussed earlier) can vary, and lose its ability to accurately measure the hole to be inspected. In accordance with well-known industry standards, dial bore gages must be calibrated regularly – generally, every few months. Mr. Oh showed Mr. Takacs the written policy for Euclid, which provided that the dial bore gages would be calibrated every 6 months. Euclid, however, had not complied with its policy for the dial bore gages which Mr. Oh had produced for this inspection. Because the dial bore gages were out of calibration, Mr. Takacs could not continue with the remainder of the inspection. This failure to comply with calibration standards was an additional reason to fail Euclid, and Mr. Takacs explained as much to Mr. Oh at that time. Mr. Oh stated that he understood.

<u>Response</u>: Agrees.

16. On September 17, 2004, Mr. Oh sent Mr. Takacs a picture of the dial bore gages with inspection stickers upon them, apparently to indicate that he had calibrated his gages.

Response: Agrees.

17. Mr. Takacs issued a written CAR to Euclid on September 20, 2004, which reflected what Mr. Takacs had told Mr. Oh, in person, on September 14.

Response: Agrees.

18. Mr. Oh responded to the written CAR on September 22, 2004 and Mr. Takacs recognized that he apparently did not understand the September 20, 2004 written CAR, because he did not recognize that the reason that the bore gage was not considered to be calibrated was because the bore gage standard was out of calibration. Mr. Takacs issued a follow-on CAR on September 23, 2004 to make this more clear for Mr. Oh.

Response: Agrees.

19. Mr. Oh responded to the September 23, 2004 CAR with a facsimile, sent on Friday, September 24, after the close of business, when Mr. Takacs had left for the day. Mr. Takacs visited Euclid during the following week and recognized that Mr. Oh still did not understand the importance of calibrating his bore gages or how he was expected to do so; moreover, Mr. Takacs recognized that Euclid's quality control problems were far more extensive than he had initially suspected, because the

calibration equipment had not been maintained as required. In order to accurately calibrate thread and dial bore gages, one uses gage block sets. Gage block sets must be independently certified as being within calibration on an annual basis and they are required to be kept in controlled environments free of dust and large temperature swings. Euclid's gage block sets had not been certified since some time in 2000 and were not kept in a controlled environment. This invalidated any calibration of gages performed upon them; in turn, making Euclid's thread and bore gages useless for quality control. The state of Euclid's gage block sets surprised Mr. Takacs because proper certification of these sets is one of the most basic requirements of quality control. Mr. Takacs provided Mr. Oh a calibration checklist during this visit and explained to him how to use it, directing that he remedy the situation immediately.

Response: Disagrees. Gage block sets were not the subject of the subsequent Corrective Action Requests of October 5th, 2004, Plaintiff's Attachment 11, or of October 6th, 2004, Plaintiff's Attachment 12.

20. On October 5, 2004, Mr. Takacs visited Euclid to see if Mr. Oh had remedied the calibration issues. Mr. Takacs and Mr. Oh went through the calibration

checklist together and Mr. Takacs explained to Mr. Oh where he had failed. Mr. Takacs issued a written CAR to Euclid that day, explaining his failure. Atch 11; App. 38. To this point, Mr. Oh had not demonstrated resolution of the problems with the thread gage not fitting the holes on the armored housings because he never had a thread or bore gage that met the required standards.

Response: Agrees. And the Quality Assurance Representative gave Euclid until October 19th, 2004 to explain to the Quality Assurance Representative "the root causes of the deficiencies and the corrective action that you intend to pursue." Plaintiff's Attachment 11.

21. On October 6, 2004, a consultant for Kaeper, Mr. Mike Jeffries, requested by email that the delivery date for the 146 armored housings be further extended to November 12, 2004 because it would not be able to meet the October 11, 2004 delivery date. Mr. Jeffries stated that Kaeper needed to additional time because of the unresolved CAR.

Response: Agrees. And the Quality Assurance Representative that day issued a Corrective Action Request and asked Kaeper, the prime Contractor, to "[p]lease respond to this corrective action request 10/20/2004." Plaintiff's Attachment 12.

22. On Thursday, October 7, 2004, Mr. Oh contacted Mr. Takacs's superior, Mr. Stephens, to arrange another meeting to address the outstanding CAR. Mr. Takacs was in a class that day, but telephoned Mr. Oh in the evening. Mr. Takacs informed Mr. Oh that he was not available the following day or Monday, October 11, 2004, which was a Federal holiday. Mr. Takacs agreed to contact Mr. Oh on October 12, 2004 so that they could arrange a meeting.

Response: Agrees. And in an electronic mail message to the Procuring Contracting Officer sent on Wednesday, October 13th, 2004 Mr. Takacs further explained: "When we did talk on Tuesday, I scheduled to visit his facility on Oct. 13 at 9 AM. He called me at 8:30 AM if that means anything. . . ." Plaintiff's Attachment 18.

23. On October 8, 2004, DCMA informed Kaeper, by letter, that it would not extend the delivery date further and that the order would be cancelled if the armored housings were not delivered on October 11, 2004, as required.

Response: Agrees.

24. On October 12, 2004, Steven Freeman, general counsel to Euclid, sent a letter to DCMA. The letter stated that 46 of the armored housings were completed and available for inspection and that the other 100 were machined and ready for inspec-

tion although they were not yet complete because they had not yet been painted. The letter asked for additional time to complete the purchase order.

Response: Agrees.

25. On October 12, 2004, because the armored housings had not been delivered by October 11, 2004 as specified by the purchase order, DCMA cancelled the purchase order.

Response: Disagrees. Defense Contract Management Area Cleveland did not "cancel" the Purchase Order. The Procuring Contracting Officer at Defense Supply Center Columbus terminated Purchase Order Number SP0750-04-M-9839 as "lapsed" in the afternoon of Tuesday, October 12th, 2004. Plaintiff's Attachment 3.

26. On October 12, 2004, Mr. Oh telephoned Mr. Takacs and asked to set up a meeting on October 13, 2004, to which Mr. Takacs agreed. On the morning of October 13, 2004, Mr. Oh contacted Mr. Takacs and asked him for an extension of time to address the CAR because other matters had demanded his attention and that, although he was close to being finished with it, he was not yet ready. On October 19, 2004, Mr. Oh telephoned Mr. Takacs and told him that he was ready to meet to close the CAR.

Response: Agrees.

27. Neither Euclid nor Kaeper ever presented completed armored assemblies to Mr. Takacs for inspection.

Response: Disagrees. As admitted in Defendant's Proposed Finding of Uncontroverted Fact Number 10, and as confirmed by outside counsel for Kaeper Machine in his letter sent on Tuesday, October 12th, 2004, Plaintiff's Attachment 20, forty-six completed and painted cast steel armor housing assemblies were presented by Euclid on September 14th, 2004 for Government Source Inspection.

28. There was no reason for Euclid to await resolution of the CAR before submitting the armored housings for painting because the gage test can be performed equally well on painted and unpainted housings. Indeed, a painted housing would be preferred because it would match the conditions in the field.

Response: Disagrees. Euclid received a series of Corrective Action Requests which reflected successive revisions of earlier-issued Corrective Action Requests. Defendant's Appendix, at pages 33 and 34; Plaintiff's Attachments 11 and 12. Euclid was given until October 19th, 2004 to resolve the later-issued Corrective Action Request. Plaintiff's Attachment 11. There was no point in taking further steps toward comple-

tion of production, or of incurring further cost risk, until the matter of the Corrective Action Requests was resolved, just as discussed in the telephone conversation of October 19th, 2004. Defendant's Proposed Finding of Uncontroverted Fact Number 26.

Respectfully submitted,

/s/ Cyrus E. Phillips, IV

Cyrus E. Phillips, IV
District of Columbia Bar Number 456500,
September 27th, 2006

1828 L Street, N.W., Suite 660
Washington, D.C. 20036-5112

Telephone: (202) 466-7008
Facsimile: (202) 466-7009
Electronic Mail: lawyer@procurement-lawyer.com

Attorney of record for Plaintiff,
Kaeper Machine, Incorporated.

## CERTIFICATE OF SERVICE

I hereby certify, under penalty of perjury, that on Wednesday, September 27th, 2006 a true and complete copy of this Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact was filed electronically via the Court's Electronic Case Filing System, through which notice of this filing will be sent to:

J. Reid Prouty, Esq.

Electronic Mail: J.Reid.Prouty@usdoj.gov

Attorney of record for Defendant,
Defense Supply Center Columbus.

/s/ Cyrus E. Phillips, IV

__________________________
Cyrus E. Phillips, IV

Attorney of record for Plaintiff,
Kaeper Machine, Incorporated.