# In the United States Court of Federal Claims

**No. 05-183C**
**(Filed: November 16, 2006)**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **KAEPER MACHINE,** | * | |
| **INCORPORATED,** | * | |
| | * | |
| **Plaintiff,** | * | **Purchase Order; 48 C.F.R. § 13.302-4;** |
| | * | **48 C.F.R. § 52.213-4(f); Equitable** |
| **v.** | * | **Estoppel; Substantial Performance** |
| | * | |
| **THE UNITED STATES,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * | * | |

*Cyrus E. Phillips, IV*, Washington, DC, for plaintiff.

*J. Reid Prouty*, U.S. Department of Justice, Washington, DC, with whom were *Peter D. Keisler, Assistant Attorney General* and *Director David M. Cohen*, for defendant.

## OPINION GRANTING THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

**FIRESTONE**, *Judge*.

This case comes before the court on the cross-motions of the parties pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). In this

action, the plaintiff, Kaeper Machine, Inc. ("Kaeper" or "plaintiff") seeks reimbursement for the costs it incurred in its effort to provide the government with armored suspension housing assembly units ("armored housing units") for tank recovery vehicles under a Defense Supply Center Columbus ("DSCC") purchase order. The government contends that Kaeper is not entitled to any costs because the purchase order lapsed when Kaeper failed to deliver the armored housing units on the specified delivery date. Kaeper contends that the purchase order did not lapse but instead became an irrevocable option contract after Kaeper proceeded with the work to the point of substantial performance. Kaeper further contends that the government violated the Federal Acquisition Regulations ("FAR") with respect to the cancellation or termination of a purchase order, 48 C.F.R. § 52.213-4(f) (2006) when it failed to obtain Kaeper's acceptance of the cancellation or process the cancellation as a termination for convenience. Kaeper argues, in the alternative, that the government should be estopped from denying the existence of a contract. For the reasons set forth below, the government's motion is **GRANTED** and Kaeper's motion is **DENIED**.[1]

## BACKGROUND

The following facts are not disputed unless otherwise noted. On February 20, 2004, the DSCC issued purchase order SP0750-04-M-9839 ("the purchase order") to Kaeper for the production of 146 armored housing units for use in United States Army

---

[1] The court has determined that oral argument is not necessary in this case.

M88 Tank Recovery Vehicles. The armored housing units are "other than commercial items." The unit price was $858 for a total price of $125,268. Under the terms of the purchase order, the 146 armored housing units were to be delivered by August 23, 2004. Although the DSCC issued the purchase order, the purchase order specified that the Defense Contract Management Agency ("DCMA") would administer the purchase order.[2] Pl.'s Ex. 1.

On February 26, 2004, Kaeper subcontracted performance of the purchase order to Euclid Machine, Inc. ("Euclid"), located in Eastlake, Ohio. Pl.'s Ex. 5. The government learned of the subcontract with Euclid in July 2004 when Kaeper requested that the contracting officer change the inspection and delivery point from another facility to Euclid's facility. Pl.'s Ex. 7. In an electronic message dated July 22, 2004, a representative of DCMA informed Betty Lavery, the procuring contracting officer, that Euclid would be manufacturing the units. "Just to give you a heads-up – Kaeper Machine (1HFX2) has an association with Euclid Machine and Mr. Oh. DCMA received a request to change the inspection point on order SP0750-04-M-9839 from Kaeper Machine to Euclid Machine." Pl.'s Ex. 8. The reason for the concern was revealed in another electronic message dated that same day to in-house counsel at DSCC, in which Ms. Lavery explained that Euclid had provided nonconforming armored housing units to the

---

[2] Because both DSCC and DCMA were involved with the purchase order, the court refers to a procuring contracting officer from DSCC and an administrative contracting officer from DCMA.

government in the past and that she believed that Euclid would provide Kaeper the 40 non-conforming armored housing units that she had cancelled on a prior purchase order with Euclid. Pl.'s Ex. 8. Ms. Lavery sent another electronic message that same day to Donald Lushbaugh, item manager at DSCC, stating: "WILL YOU PLEASE PUT A FREEZE CODE ON THIS STOCK?" Pl.'s Ex. 8. In an electronic message dated the following day, Mr. Lushbaugh replied: "I have issued a 'WATCHDOG' to the receiving Depot to place material into 'L' upon receipt. Once the report is issued I will direct some assets for testing." Pl.'s Ex. 8. On July 26, 2004, Steve Haschak, the DCMA contracting officer for the purchase order, denied Kaeper's request to change the inspection and delivery point to Euclid.

On August 4, 2004, after Euclid became involved, Kaeper requested that the delivery date of 100 of the 146 armored housing units be changed from August 23, 2004 to October 11, 2004. Pl.'s Ex. 9. On August 18, 2004, Kaeper offered a $1,989 reduction in the $125,268 total price for the purchase order in exchange for the extension to October 11, 2004. Pl.'s Ex. 10. On August 19, 2004, in response to Mr. Haschak's message regarding Kaeper's offered reduction, Ms. Lavery instructed DCMA to issue a modification extending the delivery date. Pl.'s Ex. 10. On August 27, 2004, the government modified the purchase order by extending the final delivery date for all of the units to October 11, 2004,[3] and by reducing the total price by $1,989 from $125,268 to

[3] The revised delivery date, Monday, October 11, 2004, was Columbus Day, a federal holiday.

$123,279. Pl.'s Ex. 2.

On September 14, 2004, Ed Takacs, the government's quality assurance representative, performed his first inspection of the armored housing units manufactured by Euclid under the purchase order. Euclid had completed 46 of the 146 at that point. Based on his observations, Mr. Takacs explained to Mr. Oh, Euclid's owner, that the armored housing units did not conform with the purchase order specifications and thus would be useless in the field. The parties disagree as to the extent of the problems Mr. Takacs encountered during his inspection. The plaintiff contends that the problem was limited to the calibration of a piece of Euclid's inspection equipment – the dial bore gage. Pl.'s Response to Def.'s Proposed Findings of Uncontroverted Fact ¶ 10. The government contends that, in addition to problems with the calibration with the dial bore gage, the thread gage – which is a standard used to ensure that the corresponding threaded hole on a manufactured item is of the correct size – did not fit into the threaded bolt holes on the armored housing units. Def.'s Proposed Findings of Uncontroverted Fact ¶ 12.

On September 20, 2004, Mr. Takacs issued a written Corrective Action Request ("CAR") to Euclid, which reflected what Mr. Takacs had told Mr. Oh in person on September 14, 2004. Mr. Oh responded to the written CAR on September 22, 2004. Recognizing that Mr. Oh did not understand the reason for the CAR, Mr. Takacs issued a follow-on CAR on September 23, 2004. Mr. Oh responded to the September 23, 2004 CAR on Friday, September 24, 2004. Sometime the following week (the plaintiff states

that it was on Thursday, September 30, 2004), Mr. Takacs visited Euclid and gave Mr. Oh a "calibration check off list" (the plaintiff calls it an "Audit Checklist" and contends that it returned the completed "Audit Checklist" to Mr. Takacs the following day. Pl.'s Proposed Findings of Uncontroverted Facts ¶ 10).

On October 5, 2004, Mr. Takacs visited Euclid to see if Mr. Oh had remedied the calibration issues. Mr. Takacs and Mr. Oh went through the calibration checklist together and Mr. Takacs explained to Mr. Oh where Euclid had failed. Mr. Takacs issued a written CAR to Euclid that day, stating that the calibration system was rejected for the following reasons:

> A) There was no way to show that the calibrated tools were calibrated against certified equipment having known traceability to a national or internationally recognized standard.
>
> B) There was no way the supplier was able to ensure that the required environmental conditions are suitable for the calibration on the calibrated inspection equipment.
>
> C) Calibration integrity is not protected and maintained during handling, transportation, preservation and storage of inspection, measuring and test equipment.

Pl.'s Ex. 11. The CAR also requested a written response by October 19, 2004 explaining "the root causes of the deficiencies and the corrective action that you intend to pursue." Pl.'s Ex. 11. On October 6, 2004, the government issued a separate CAR to Kaeper, which stated that the "Root Cause of Defect" was "Prime contractor, not controlling sub tiers. Not verifying Quality Systems at vendors. Also not controlling the sub vendors calibration system." Pl.'s Ex. 12. Kaeper was asked to respond by October 20, 2004.

Pl.'s Ex. 12.

On October 6, 2004, via an electronic message, Kaeper requested an extension of the delivery date until November 12, 2004. Pl.'s Ex. 13 ("Due to GSI [government source inspection] CAR . . . issued to Euclid Machine, Kaeper will not meet the 10-11-04 delivery date on the above order for the 146 pieces. Please extend the delivery date to Nov. 12, 2004. Thank you.").

On October 7, 2004, Ms. Lavery, forwarded Kaeper's request to Mr. Haschak, in an electronic message stating: "If Kaeper Machine is unable to meet this delivery schedule, the order will be cancelled. Do you want to send a letter or do you want me to? Please advise." Pl.'s Ex. 12.[4] In an electronic message sent later that day, Sandra Broerman of the DCMA replied to Ms. Lavery as follows:

> I just spoke with Kay Hwang, Kaeper's owner. He is scrambling, in the 11th hour, to get these completed. He is awaiting a Corrective Action Response from Jim Oh at Euclid Machine. I expect to hear from him tomorrow. I do not anticipate, unless he is also a magician, that these will be ready by Monday[] . . . I'll let you know once I hear from him."

Pl.'s Ex. 13.

Also on October 7, 2004, Mr. Oh at Euclid called Mr. Takacs' supervisor because Mr. Takacs was attending a class. Mr. Takacs returned the call later that evening, and in an electronic message dated several days later, described the call as follows:

> [T]he main reason [Mr. Oh] called was to get clarification about the CAR that

[4] Kaeper contends that this communication happened on October 6, 2004; however, the copy of the electronic message contained in the record before the court is dated October 7, 2004.

> I had presented to him over his calibration system. He also wanted me to tell him when I would be able to come in to perform GSI on the parts he had ready for me. He did not tell me any specific number. We mostly talked about the CAR. I told him that I would call on Tuesday, Oct. 12 when I returned to work as I was in class and was going to take Friday off.

Pl.'s Ex. 18.

On Friday, October 8, 2004, the administrative contracting officer from DCMA informed Kaeper, by letter, that its request for a second extension of the delivery date was rejected and that the government would not extend the delivery date any further. The letter further stated that the order would be cancelled if the armored housing units were not delivered on October 11, 2004, as required. The letter stated:

> As you know, the original CDD [contractual delivery date] was Aug. 23, 2004. That dated was revised to Oct[.] 11, 2004 by modification A00001. In consideration for this contractual revision, Kaeper Machine offered and the Government accepted a reduction of $1989.00 in the purchase order amount.
>
> Be advised that, after due consideration, if Kaeper Machine is unable to meet this delivery schedule of Oct. 11, 2004, the order will be cancelled. Since your company offered the consideration noted above, we may peruse [sic] collection of this amount as a debt owed to the Government.

Pl.'s Ex. 14.

In a letter to DCMA dated October 11, 2004, Steven Freeman, general counsel to Euclid, stated that 46 of the armed housing units were completed and available for inspection and that the other 100 were machined and ready for inspection although they were not yet complete because they had not yet been painted. The letter asked for additional time to complete the purchase order. Pl.'s Ex. 20.

On Tuesday, October 12, 2004, at 8:30 a.m., Mr. Oh at Euclid telephoned Mr. Takacs and they arranged for Mr. Takacs to visit Euclid's facility on October 13, 2004, at 9:00 a.m. Pl.'s Ex. 18.

That same day, DCMA sent Ms. Lavery the following "Delay Notice" concerning the purchase order with Kaeper: "The contractor did not ship product by the CDD of 10/11/04.; the response is under review. Kaeper expects to ship product within the next few days. This is only possible if the CAR response adequately addresses the Quality system deficiency . . . the contractor's record keeping of equipment calibration was found to be lacking under a MIL-I or ISO system." Pl.'s Ex. 15.

On October 12, 2004, Ms. Lavery also issued modification P00001, stating that the purchase order had lapsed: "The above cited purchase order was an offer to purchase the supplies described therein provided that delivery was made by 10/11/2004. Since that date was not met, the Government's offer to purchase has lapsed. No deliveries will be accepted by the Government under this order . . . ." Pl.'s Ex. 3.

On the morning of Wednesday, October 13, 2004, Mr. Oh from Euclid contacted Mr. Takacs and asked him for an extension of time to address the CAR because other matters had demanded his attention. Mr. Oh told Mr. Takacs that, although he was close to being finished with the order, he was not ready. In an electronic message dated that same day, Mr. Takacs – in reply to a message from Ms. Lavery asking whether Mr. Oh had requested a government source inspection the previous day – stated: "Not

specifically, but he did imply. I would not look at parts until the corrective action is complied with. Is he even ready right now? That I don't know. He did request this morning for more time to attend to other more pressing needs." Pl.'s Ex. 18.

On October 19, 2004, Mr. Oh telephoned Mr. Takacs and told him that he was ready to meet to close the CAR.

Kaeper filed a complaint in this court on February 2, 2005. The parties subsequently filed cross-motions for summary judgment.

## DISCUSSION

### I. Standard of Review

The parties have filed cross-motions for summary judgment on the complaint under RCFC 56. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A fact is material if it would affect the outcome of the suit. Id. at 248. Doubts as to factual issues must be resolved in favor of the non-moving party. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Liberty Lobby, 477 U.S. at 248. In order to defeat summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." RCFC 56(e); Celotex, 477 U.S. at 324.

Cross-motions for summary judgment are not an admission that no material facts remain at issue. See Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997) (citations omitted). "Each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts." Id.

## II. The Plaintiff Has Failed to State a Claim under the FAR Purchase Order Cancellation and Termination Provisions

Kaeper contends that it is entitled to summary judgment because it had accepted the government's purchase order by substantial performance as provided for under FAR § 13.004(c) (2006) ("[T]he supplier may indicate acceptance by furnishing the supplies or services ordered or by proceeding with the work to the point where substantial performance has occurred."). Kaeper contends that it substantially performed because its subcontractor had tendered some armored housing units for government source inspection on September 14, 2004, and that its subcontractor had planned to make another tender of armored housing units for government inspection on October 13, 2004, shortly after the October 11, 2004 delivery date. Kaeper argues that October 11, 2004 was not a valid delivery date because it was Columbus Day, a federal holiday. Kaeper further contends that the government's concerns about quality assurance did not mean that Kaeper failed to

substantially perform because the government's concerns were with Euclid's record-keeping systems rather than with the armored housing units themselves.

As a result of this alleged substantial performance, Kaeper contends that the government was required to request Kaeper's acceptance of a cancellation of the purchase order under FAR § 13.302-4(b) (2006) ("[T]he contracting officer shall notify the contractor in writing that the purchase order has been canceled, request the contractor's written acceptance of the cancellation, and proceed as follows: . . . (2) If the contractor does not accept the cancellation or claims that costs were incurred as a result of beginning performance under the purchase order, the contracting officer shall process the termination action as prescribed in [FAR §52.213-4].").[5]

The government contends, in its cross-motion for summary judgment, that it did not violate the FAR because it did not cancel the purchase order, but rather the purchase order lapsed when Kaeper failed to deliver the armored housing units by October 11, 2004, the extended delivery date. In this connection, the government notes that Kaeper was told on October 6, 2004 that it would not be given an extension until November 12, 2004 and that if the armored housing units were not delivered by October 11, 2004, the units would not be accepted. The government contends that this should end the court's inquiry. The government further argues, however, that even if Kaeper was unable to

---

[5] FAR § 52.213-4 (2006) provides, in pertinent part, a contract clause related to the termination of a contract for the government's convenience. The clause requires that the government pay the contractor "a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges . . ." Id. 4-(f).

make delivery on October 11, 2004 because it was a federal holiday, Kaeper should not prevail because Kaeper has not provided any evidence to show that Kaeper was able to tender the 146 armored housing units the next day, on October 12, 2004. To the contrary, the government argues that it was clear that Euclid was not prepared to tender the armored housing units on that date. The government points to Euclid's October 11, 2004 letter from its counsel to the government in which Euclid acknowledged that the majority of the armored housing units were not ready for delivery on the due date because they had not yet been painted. The government also points to the statements of Euclid's owner, Mr. Oh, who told the government's quality assurance representative on October 13, 2004 that Euclid was not yet ready for an inspection because Mr. Oh had to tend to other more "pressing" business. Indeed, Euclid did not contact the government's quality assurance representative again until October 19, 2004.

Finally, the government argues that Kaeper's claim based on substantial performance is based on a misunderstanding of the law, in any event. The government argues that substantial performance precludes the government from cancelling, without compensation, a purchase order before the delivery date. However, where the contractor fails to deliver goods by the delivery date – which is what occurred here – substantial performance does not prevent a lapse of a purchase order. According to the government the purpose of the FAR provision is to protect vendors when the government decides that it does not want the goods it has ordered and cancels the order before the goods are due.

For this proposition, the government relies on Davies Precision Machining, Inc. v. United States, 35 Fed. Cl. 661 (1996); Rex Systems, Inc., ASBCA No. 45301, 93-3 BCA ¶ 26, 065, 1993 WL 190365 (May 26, 1993); Klass Engineering, Inc., ASBCA No. 22052, 78-2 BCA ¶ 13,326, 1978 WL 2186 (May 22, 1978).

The court agrees with the government that the purchase order lapsed when Kaeper failed to deliver – or at a minimum make available for government source inspection – the 146 armored housing units by the delivery date of October 11, 2004. Even assuming that the federal holiday on October 11, 2004 prevented Kaeper from making delivery until October 12, 2004, Kaeper has not presented any evidence to show that it was prepared to deliver the 146 armored housing units by October 12, 2004. Instead, days before the armored housing units were due for delivery, Kaeper and its subcontractor were seeking additional time to resolve the quality control issues and to complete the job. Indeed, on October 13, 2004, the subcontractor stated it needed more time in order to respond to "more pressing needs." Pl.'s Ex. 18.

Because Kaeper failed to deliver the armored housing units by the delivery date specified in the purchase order, the court finds that the purchase order lapsed. As such, the cancellation provisions under FAR § 13.302-4 do not apply. As this court held in Smart Business Machines v. United States, 72 Fed. Cl. 706 (2006) (citing Rex Systems, Appeal of Friedman Enter., Inc., ASCBA No. 54886, 05-2 BCA ¶ 32991, 2005 WL 1385135 (June 3, 2005); Appeal of Alsace Indus. Inc., ASCBA No. 51709, 99-1 BCA ¶

30227, 1999 WL 61201 (Jan. 29, 1999)), when a supplier fails to tender performance in accordance with the terms and conditions of a purchase order, the purchase order lapses and the contractor bears the cost of non-performance. Specifically, the court explained:

> Thus, 48 C.F.R. § 13.302-4 protects suppliers in cases where the government cancels or terminates a purchase order before the supplier has had an opportunity to comply with the purchase order's delivery date. In those cases, the government is liable for its decision to terminate the offer. However, where, as here, the supplier was given the opportunity to comply with the offer but admittedly failed to comply after the time for performance had passed, the purchase order lapsed and the plaintiff bears the costs of its own lack of performance.

Id. at 709.

Based on the same reasoning of the court in Smart Business Machines, the court finds that the purchase order here lapsed when Kaeper failed to deliver the specified units by the delivery date. Accordingly, Kaeper has failed to state a claim for relief under the FAR cancellation and termination provisions.

## III. The Plaintiff Has Failed to State an Equitable Estoppel Claim Against the Government.

Kaeper contends that, even if the purchase order did lapse, the government should be estopped from denying the existence of a contract after the delivery date had passed. Kaeper contends that it was led to believe that it had a contract after the delivery date had passed based on the actions of various government representatives. Kaeper contends that in such circumstances, the government is required to follow the FAR procedures with respect to the cancellation or termination of a purchase order.

The essence of Kaeper's allegations appear to be that the procuring contracting officer was looking for a pretext to end the purchase order, that the quality assurance representative was not available to inspect the armored housing units on and during the days leading up to the delivery date, and that the quality assurance representative misled Kaeper to believe that it had additional time to deliver the armored housing units because Euclid and Kaeper received correction notices with response dates that came after the delivery date.

The doctrine of equitable estoppel is a judicial remedy by which a party may be precluded, by its own acts or omissions, from asserting a right to which it otherwise would have been entitled. Conner Bros. Constr. Co. v. United States, 65 Fed. Cl. 657, 692 (2005). In order to establish a prima facie case of equitable estoppel against the government a party must establish four essential elements: (1) the government must know the true facts; (2) the government must intend that its conduct will be acted upon or must so act that the party claiming estoppel has a right to believe it is so intended; (3) the party asserting estoppel must be ignorant of the true facts; and (4) the party asserting estoppel must rely on the government's conduct to its detriment. American Electronic Laboratories, Inc. v. United States, 774 F.2d 1110, 1113 (Fed. Cir. 1985). See also Advanced Materials v. Perry, 108 F.3d 307, 311-312 (Fed. Cir. 1997).

A party invoking the doctrine of equitable estoppel against the government "bears a heavy burden." Conner Bros., 65 Fed. Cl. at 692 (citing Heckler v. Cmty. Health Servs.

of Crawford County, Inc., 467 U.S. 51, 61 (1984)). Importantly, the Court of Appeals for the Federal Circuit has held that some form of "affirmative misconduct" must be shown when an equitable estoppel claim is asserted against the government. United Pacific Ins. Co. v. Roche, 401 F.3d 1362, 1366 (Fed. Cir. 2005); Rumsfeld v. United Techs. Corp., 315 F.3d 1361, 1377 (Fed. Cir. 2003); Zacharin v. United States, 213 F.3d 1366, 1371 (Fed. Cir. 2000); Henry v. United States, 870 F.2d 634 (Fed. Cir. 1989); Hanson v. Office of Personnel Management, 833 F.2d 1568 (Fed. Cir. 1987). "Although the Supreme Court has not adopted a per se rule prohibiting the application of equitable estoppel against the government under any circumstances, it has made clear that 'the government may not be estopped on the same terms as any other litigant.'" Zacharin, 213 F.3d at 1371 (quoting Heckler, 467 U.S. at 60). Tested by these standards, Kaeper has failed to establish a claim for equitable estoppel in this case.

In order to show that the government knew the true facts but kept Kaeper in the dark to its detriment, Kaeper relies on the following facts. First, Kaeper notes that the procuring contracting officer, Ms. Lavery, never informed Kaeper of her concerns about Euclid or the fact that the government intended to place Euclid's armor housing units under a "freeze code." Kaeper infers from these facts that Ms. Lavery wanted to keep Kaeper from delivering Euclid's armored housing units and that she was looking for an excuse to terminate the purchase order.

Kaeper also contends that the government engaged in misconduct when Ms.

Lavery terminated the purchase order on the assumption that Euclid had failed to request government source inspection, when Euclid had presented armored housing units for government source inspection on September 14, 2004, and had requested government source inspection on the morning of October 12, 2004.[6] Kaeper also contends that the government's quality assurance representative, Mr. Takacs, kept Euclid from tendering armored housing units for government source inspection because Mr. Takacs did not promptly explain his concerns to Euclid. Kaeper contends that evidence of the government's misconduct is further demonstrated by the fact that Mr. Takacs was unavailable to conduct government source inspection at Euclid on October 7 (Thursday), October 8 (Friday), October 11 (Monday), or October 12 (Tuesday), 2004.[7]

Kaeper endeavors to show detrimental reliance based on the fact that the CARs issued to Kaeper and Euclid contained response dates that were after the delivery date specified in the purchase order. Kaeper also relies on the fact that the government took from October 6 to October 8, 2004, to inform Kaeper that the government would not

---

[6] Kaeper argues that Mr. Takacs acknowledged that Euclid's owner "implied" that it was requesting a government source inspection on October 12, 2004. Kaeper relies on an electronic message dated October 13, 2004, from Mr. Takacs to Ms. Lavery – in reply to a message from Ms. Lavery asking whether Mr. Oh had requested a government source inspection the previous day – stating: "Not specifically, but he did imply. I would not look at parts until the corrective action is complied with. Is he even ready right now? That I don't know. He did request this morning for more time to attend to other more pressing needs." Pl.'s Ex. 18.

The government argues that this electronic message instead demonstrates that Euclid was not ready for government source inspection for all of the armored housing units on either October 12 or October 13, 2004.

[7] Kaeper also contends that the CAR was related to Euclid's record-keeping and was unrelated to the quality of the armored housing units themselves.

extend the delivery date of the purchase order, and threatened to seek recovery of the price reduction agreed upon for the previous extension of the delivery date.

In support of its argument, Kaeper cites Emeco Industries, Inc. v. United States, 485 F.2d 652 (Ct. Cl. 1973), for the proposition that the government's failure to speak up may be used to establish estoppel in appropriate cases.[8] Kaeper contends that the government's silence in Emeco Industries is similar to the procuring contracting officer's

---

[8] In Emeco Industries, the government issued a solicitation for the manufacture of 31,896 index card boxes. 485 F.2d at 653. The government requested a plant inspection report to determine if the plaintiff's facilities were capable of producing the entire 31,896 boxes within the time specified in the solicitation. Id. The report noted that the contractor had made arrangements to purchase four dies, at a total cost of $10,300, which were essential for it to manufacture the boxes. Id. The government issued a purchase order to the contractor for 2,713 boxes, at a total price of $8,247.52. Id. at 654. The contractor began producing boxes, and intending to manufacture all of the 31,896 called for in the government's original solicitation, continued producing boxes beyond the 2,713 boxes called for in the purchase order. Id. Unbeknownst to the contractor, the government had placed an order with another company for the remaining 29,183 boxes. Id. By the time the contractor learned that the government had contracted with another company for the remaining boxes, the contractor had produced 6,000 boxes over the 2,713 required in the government's purchase order. Id.

The Emeco Industries court agreed with the government that the parties had not entered into a formal contract for 31,896 boxes. Id. at 656. However, the court held that the government was estopped from denying the existence of a contract for 31,896 boxes. Id. at 657. The court stated that estoppel was appropriate because the government had failed to notify the contractor that the government was considering a lower bid from another company, id.; the government had requested an inspection report as to whether the contractor was capable of manufacturing the full number of boxes within 70 days after being awarded the contract, id. at 658; the government was aware that it was necessary for the contractor to purchase dies at a cost of over $10,000 in order to be able to perform the contract, and it was "inconceivable" that the contractor would have incurred such an expense if it had known that it would only receive an $8,247.52 award, id.; the government had conducted an on-site inspection, which is not normally done where contracts of less than $10,000 are involved, id. at 659; the contractor was unaware that the government had awarded a contract to another company for the remaining number of boxes, id.; and the contractor had relied on the government's acts to its detriment by ordering dies at a cost of $10,300 and by ordering material for the production of the entire quantity of boxes. Id.

not communicating to Kaeper her concerns about Euclid or the "freeze code" request. Kaeper contends that the contracting officer's silence, in addition to the other alleged conduct by the government cited above, merits the application of estoppel against the government here.

In response, the government argues that there is no basis for estoppel here and that Kaeper's failure to deliver the armored housing units by the delivery date was due to its own subcontractor's inability to meet quality control requirements and to complete the work on time. With regard to the actions of the procuring contracting officer, the government contends that Ms. Lavery's inquiry about a "freeze code" does not support Kaeper's allegation that the government intended any ill-will toward Euclid. First, the government argues that there is a "strong presumption" that federal employees act in good faith. Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002). Second, the government argues that DCMA's willingness to grant Kaeper's initial request for an extension of time, which was sought after the DCMA became aware of Euclid's role in the purchase order, demonstrates that DCMA acted in good faith.

The government also argues that Mr. Takacs, the government's quality assurance representative, did not mislead Kaeper or Euclid into believing that they would be excused from meeting the October 11, 2004 delivery date. The government contends that it was clear to both Kaeper and Euclid that Mr. Takacs did not have the authority to extend the delivery date. The government argues that both Kaeper and Euclid knew that

they needed to obtain an extension from the contracting officer, as evidenced by Kaeper's request dated October 6, 2004, and Euclid's request dated October 11, 2004. Pl.'s Ex. 13, 20.

Similarly, the government argues that Mr. Takacs did not prevent Kaeper from meeting the delivery date. The undisputed record shows that the armored housing units were not ready by October 11, 2004 or by October 12, 2004. The letter dated October 11, 2004 (which appears to have been faxed to the government on October 12, 2004) from Euclid's general counsel to DCMA, acknowledges that more than two-thirds of the armored housing units were not ready because they had not been painted. Pl.'s Ex. 20. In addition, the government notes that it is not disputed that Euclid cancelled the October 13, 2004 meeting with Mr. Takacs because Euclid needed to respond to "more pressing needs." Pl.'s Ex. 18. Indeed, it was not until October 19, 2004, that Euclid contacted Mr. Takacs to address the issues raised in the CAR.

The government further contends that Kaeper was not prejudiced by the government's two-day delay in responding to Kaeper's request for a second extension of time. The government argues that Kaeper waited until three business days before delivery was due to request an additional 30 days of time to complete the armored housing units. Thus, the government contends, it was Kaeper that acted in an untimely manner, not the DCMA.

Based on all of these undisputed facts, the government argues that Kaeper has

failed to show that the government knowingly misled Kaeper or that the government otherwise acted improperly. In such circumstances, the government argues that Kaeper has failed to establish an estoppel claim.

The court agrees with the government that Kaeper has failed to establish an estoppel claim against the government. The facts here are different from those that the Emeco Industries court relied on in estopping the government from denying the existence of a contract. Furthermore, the plaintiff's reliance on Emeco Industries is misplaced in light of the more recent decisions by the Federal Circuit holding that affirmative misconduct is a prerequisite for invoking equitable estoppel against the government. See, e.g., United Pacific, 401 F.3d at 1366. Neither affirmative misconduct, or the elements of estoppel – the government's knowledge of true facts, the government's intending that its conduct will be acted upon, the contractor's ignorance of the true facts, the contractor's reliance on the government's conduct to its detriment – are present here. Here, the record demonstrates that Kaeper did not meet the delivery deadline because its subcontractor had not completed the 146 armored housing units by the deadline, not because of any affirmative misconduct by the government.

To begin, the court agrees with the government that Ms. Lavery's concerns about Euclid did not cause any harm. To the contrary, the undisputed record demonstrates that the government granted Kaeper's first request for an extension of time after it learned that Euclid would be producing the armored housing units. Had the government wanted an

excuse to terminate the purchase order, the government could have refused to grant the first time extension. Indeed, the undisputed record shows that the government's quality assurance representative worked extensively with Euclid to help them with the armored housing units. For example, the quality assurance representative created a quality checklist and went through all of Euclid's problems with Euclid's owner, Mr. Oh.

Kaeper's contention that Kaeper and Euclid relied to their detriment on the CAR process to extend the delivery date is also unfounded. There is no evidence to suggest that the government quality assurance representative stated that the delivery date would be extended or misled Kaeper in any way. Both Kaeper and Euclid knew that they could obtain an extension of the delivery date only from the contracting officer, as evidenced by both of their requests for more time. Pl.'s Ex. 13, 20. Moreover, the quality assurance representative did not have the authority to change the delivery date, in any event. The only person authorized to extend the delivery date was the contracting officer. As the United States Supreme Court has held, it is the responsibility of a contractor to determine whether a government agent has authority to bind the government. See Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947) ("Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority."). See also Trauma Service Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997); City of El Centro v. United States, 922 F.2d 816, 821 (Fed.

Cir. 1990); Potter v. United States, 1964 WL 8681 at *5 (Ct. Cl. 1964) ("[N]o unauthorized officer of the Government can waive the terms of the contract.").

Kaeper's claim that estoppel should apply because Mr. Takacs was unavailable to conduct an inspection on the delivery date, Monday, October 11, 2004, because it was a federal holiday (or on the other dates alleged by Kaeper – October 7, 8, and 12) is also unsupported. It is not disputed that Euclid had not completed the 146 armored housing units by October 11, 2004. Euclid's counsel conceded as much in his October 11, 2004 letter to the government, in which he asked for more time on behalf of Euclid. Pl.'s Ex. 20. The undisputed record further establishes that Euclid cancelled the October 13, 2004 meeting with Mr. Takacs. Indeed, Euclid did not contact Mr. Takacs to resolve the quality assurance issues until October 19, 2004. Because Kaeper has failed to demonstrate that 146 armored housing units were finished and ready for government inspection on October 11, 2004, Mr. Takacs' alleged unavailability to conduct an inspection on that date did not prejudice Kaeper.

Finally, there is no evidence of government wrong-doing or prejudice associated with the government's decision to take two days to respond to Kaeper's request for an second extension of time. Kaeper decided to wait until the last moment to seek more time. The government did not owe Kaeper additional time.

As discussed above, there is no evidence that the procuring contracting officer, administrative contracting officer, or quality assurance representative prevented Kaeper

from delivering the armored housing units by the delivery date, or that Kaeper would have been justified in believing that the CAR process could provide Kaeper with additional time to deliver the armored housing units. For all of these reasons, Kaeper has failed to establish estoppel against the government in this case. Kaeper has not established any affirmative misconduct by the government. Indeed, it has not shown how any conduct by the government kept Kaeper from meeting the purchase order delivery date. Based on the above-noted undisputed facts, there is no basis here for estopping the government from claiming that the purchase order has lapsed.

## CONCLUSION

The government's motion for summary judgment is **GRANTED** and the plaintiff's motion for summary judgment is **DENIED**. The Clerk of the Court is directed to enter judgment for the government. Each party shall bear its own costs.

**IT IS SO ORDERED**.

**s/Nancy B. Firestone**
NANCY B. FIRESTONE
Judge